UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Case No. 1:26-cv-00424-SKC-MDB

BRIDGET A. WARNE, individually and on
behalf of all similarly situated,

**ORAL ARGUMENT
REQUESTED**

Plaintiff,

v.

UNITED WHOLESALE MORTGAGE, LLC,

Defendant.

---

**DEFENDANT UNITED WHOLESALE
MORTGAGE, LLC'S MOTION TO TRANSFER VENUE,
DISMISS THE COMPLAINT, AND STRIKE CLASS ALLEGATIONS**

Defendant United Wholesale Mortgage, LLC ("UWM"), by and through its undersigned counsel, respectfully moves this Court to transfer this action to the United States District Court for the Eastern District of Michigan (the "Michigan Court") pursuant to 28 U.S.C. § 1404(a) or, in the alternative, to dismiss the First Amended Complaint ("FAC") for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and to strike class allegations pursuant to Fed. R. Civ. P. 12(f).

***First,*** the Court should transfer this case to the Michigan Court for the convenience of the parties and witnesses and in the interest of justice. Virtually all relevant witnesses, documents, and operative facts are located in Michigan; key nonparty witnesses—i.e., the brokers who made the calls—are subject to compulsory process only in Michigan and contractually subject to Michigan law and Michigan venue; and two other putative class actions involving overlapping factual and legal allegations and issues are already pending in the Michigan Court—including one filed by Plaintiff's counsel. As the U.S. Supreme Court has long held, "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960). The transfer also permits consolidation of cases, reducing discovery redundancies and promoting judicial efficiency—further counseling in favor of the § 1404(a) transfer.

***Second***, the FAC fails to state a claim against UWM under the Telephone

1

Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Plaintiff alleges no facts suggesting that UWM itself initiated the calls at issue—so as to support a claim of direct liability against UWM. As to vicarious liability, the FAC is devoid of plausible, non-conclusory facts establishing actual authority, apparent authority, or ratification—potential bases for vicarious liability under the TCPA:

- ***Actual Authority.*** The UWM Broker Agreement expressly disclaims agency and forbids brokers from holding themselves out as UWM's agents. Actual agency cannot exist where the contract affirmatively prohibits it. Further, the FAC does not contain any facts that plausibly suggest that UWM ***controlled*** the brokers' day-to-day activities or communications, or had the power to give brokers interim instructions on how to run their business. These are quintessential to establishing agency.

- ***Apparent Authority.*** Any purported claim of apparent authority similarly fails because it rests solely on the brokers' own statements, not on manifestations of brokers' authority by UWM, and Plaintiff does not allege reliance on any conduct by UWM. To the extent Plaintiff relies on the support and tools UWM makes available to its broker clients to establish apparent authority, that theory necessarily fails because Plaintiff does not allege that she knew, let alone relied on, ***UWM's*** representations of agency.

- ***Ratification.*** Ratification requires knowledge of the unlawful acts by the principal and, despite this knowledge, acceptance of the benefits of the acts in question. UWM is not alleged to have accepted any benefits of the brokers' alleged acts—such as originating the loans—after learning of the unlawful acts.

***Third***, in addition to dismissal under Rule 12(b)(6), the Court should strike class allegations under Rule 12(f). On the face of the FAC, the proposed "Do Not Call Registry" and "Stop Request" classes are impermissibly fail-safe because class membership depends on: (a) whether UWM is directly or vicariously liable for the

calls; and (b) whether the communication constitutes a "telephone call" under 47 U.S.C. § 227(c)(5). All of these are merits-based determinations that exclude non-prevailing claims from the class—and are thus failsafe classes. No amount of discovery will remedy these defects, warranting the striking of class allegations at the pleadings stage.

On May 12, 2026, UWM sought concurrence in the relief requested via email, but such concurrence was not granted.

WHEREFORE, UWM requests this Honorable Court issue an Order:

A.    Transferring this action to the Michigan Court;

B.    Dismissing the FAC in its entirety with prejudice;

C.    Striking class allegations in the FAC; and

D.    Awarding attorneys' fees, costs, and all other relief to which UWM is entitled.

Dated: May 14, 2026                  Respectfully submitted,

FOLEY & LARDNER LLP

By: */s/Irina Kashcheyeva*
Irina Kashcheyeva
Amir El-Aswad
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone: (313) 234-7100
Email: ikashcheyeva@foley.com
Email: ael-aswad@foley.com

Kelsey C. Boehm
FOLEY & LARDNER LLP
1144 15th Street, Suite 2200

3

Denver, CO 80202
Telephone: (720) 437-2000
Email: kboehm@foley.com

*Counsel for Defendant United Wholesale
Mortgage, LLC*

4

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Case No. 1:26-cv-00424-SKC-MDB

BRIDGET A. WARNE, individually and on
behalf of all similarly situated,

        Plaintiff,

v.

UNITED WHOLESALE MORTGAGE, LLC,

        Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNITED
WHOLESALE MORTGAGE, LLC'S MOTION TO TRANSFER VENUE,
<u>DISMISS THE COMPLAINT, AND STRIKE CLASS ALLEGATIONS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

STATEMENT OF ISSUES PRESENTED ...........................................................ix

I.     INTRODUCTION.................................................................................... 1

II.    FACTUAL BACKGROUND..................................................................... 3

III.   STANDARD OF REVIEW ...................................................................... 9

IV.    TRANSFER IS PROPER UNDER 28 U.S.C. § 1404(a)........................ 10

V.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM ............ 18

    A.    The FAC Fails To State A Direct Liability Claim. .......................... 18

    B.    The FAC Fails To State A Vicarious Liability Claim ...................... 19

        1.    The FAC Fails To Plausibly Allege Actual Authority ................ 20

        2.    The FAC Fails To Plausibly Allege Apparent Authority ........... 24

        3.    The FAC Fails To Plausibly Allege Ratification ........................ 26

VI.    THE COURT SHOULD STRIKE CLASS ALLEGATIONS. ................ 28

VII.   CONCLUSION ...................................................................................... 30

CERTIFICATION OF CONFERRAL ..................................................................... 31

AI CERTIFICATION AS TO DEFENDANT UNITED WHOLESALE
    MORTGAGE, LLC'S MOTION TO DISMISS AND STRIKE CLASS
    ALLEGATIONS.......................................................................................... 32

CERTIFICATE OF SERVICE .............................................................................. 33

## TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
   722 F.3d 1229 (10th Cir. 2013) ............................................................................. 20

*Abolaji v. Parker 1833 LLC*,
   2025 WL 2379644 (D. Colo. Jan. 8, 2025)............................................................. 26

*Alfaro-Huitron v. Cervantes Agribusiness,*
   982 F.3d 1242 (10th Cir. 2020)............................................................................. 21

*Anza Tech., Inc. v. Xilinx, Inc.*,
   2017 WL 4864947 (D. Colo. Oct. 27, 2017) ..................................................... 13, 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 10

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
   571 U.S. 49 (2013) ................................................................................................ 9

*Bailey v. Union Pac. R.R.*,
   364 F. Supp. 2d 1227 (D. Colo. 2005).................................................................. 13

*Bank v. Spark Energy, LLC*,
   860 F. App'x 205 (2d Cir. 2021)........................................................................... 19

*BASF Corp. v. Willowood, LLC*,
   359 F. Supp. 3d 1018 (D. Colo. 2019).................................................................. 21

*Bayless v. Christie, Manson & Woods Int'l, Inc.*,
   2 F.3d 347 (10th Cir. 1993) ................................................................................. 25

*Beck v. Cuyahoga Cnty.*,
   2022 WL 4363562 (N.D. Ohio Sept. 16, 2022)..................................................... 29

*Black v. Sprouts Farmers Market, Inc.*,
   2015 WL 7351511 (D. Colo. Nov. 19, 2015) ..................................................... 17, 18

*Bovino v. Incase Designs Corp.*,
   2014 WL 1796914 (D. Colo. May 6, 2014) ........................................................... 12

*Boyer v. Diversified Consultants, Inc.*,
    306 F.R.D. 536 (E.D. Mich. 2015) .......................................................................... 28

*Brokers' Choice of Am., Inc. v. NBC Universal*, Inc.,
    861 F.3d 1081 (10th Cir. 2017) ............................................................................ 20

*Brumate, Inc. v. Walmart Inc.*,
    2023 WL 3602327 (D. Colo. May 23, 2023) .......................................................... 14

*Bryant v. King's Creek Plantation, L.L.C.*,
    2020 WL 6876292 (E.D. Va. June 22, 2020) ......................................................... 29

*Cacho v. McCarthy & Kelly LLP*,
    739 F. Supp. 3d 195 (S.D.N.Y. 2024) .............................................................. 18, 26

*Callier v. Wide Merch. Inv., Inc.*,
    671 F. Supp. 3d 736 (W.D. Tex. 2023) .................................................................. 24

*Camarena v. Vanderbilt Mortg. & Fin., Inc.*,
    2015 WL 4036258 (N.D. Ill. July 1, 2015) ........................................................... 13

*Chinitz v. NRT W., Inc.*,
    2019 WL 4142044 (N.D. Cal. Aug. 30, 2019) ....................................................... 29

*Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*,
    831 F. Supp. 1516 (D. Colo. 1993) .......................................................................... 3

*Connor v. Servicequick Inc.*,
    2025 WL 2855393 (D. Colo. Oct. 8, 2025) ............................................................ 18

*ConocoPhillips Co. v. Jump Oil Co.*,
    948 F. Supp. 2d 1272 (N.D. Okla. 2013) .............................................................. 14

*Continental Grain Co. v. The FBL-585*,
    364 U.S. 19 (1960) .............................................................................................. 1, 17

*Coreslab Structures (TULSA), Inc. v. Nat'l Lab. Rels. Bd.*,
    100 F.4th 1123 (10th Cir. 2024) ................................................................ 19, 21, 24

*Costa v. Dvinci Energy, Inc.*,
    342 F.R.D. 38 (D. Mass. 2022) .............................................................................. 10

*Davis v. CVS Pharmacy, Inc.*,
    797 F. Supp. 3d 1270 (N.D. Fla. 2025) ................................................................. 29

iv

*DeClements v. RE/MAX LLC,*
    2020 WL 9259326 (D. Colo. Oct. 13, 2020) ..................................................... passim

*Doe v. G6 Hosp. Prop. LLC,*
    2025 WL 3537626 (W.D. Wash. Dec. 10, 2025) ..................................................... 21

*Donaca v. Dish Network, LLC,*
    303 F.R.D. 390 (D. Colo. 2014) ................................................................................ 19

*Donnelly v. Klosters Rederi A/S,*
    515 F. Supp. 5 (E.D. Pa. 1981) ................................................................................ 11

*Employers Mut. Cas. Co. v. Bartile Roofs, Inc.,*
    618 F.3d 1153 (10th Cir. 2010) ......................................................................... 10, 15

*Escano v. Concord Auto Protect, Inc.,*
    2023 WL 4247703 (10th Cir. June 29, 2023) ......................................................... 18

*Faulhaber v. Petzl Am., Inc.,*
    656 F. Supp. 3d 1257 (D. Colo. 2023) .............................................................. 10, 28

*Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints,*
    148 F.4th 1202 (10th Cir. 2025) ............................................................................... 10

*Gonzales v. Cordoba Legal Grp., LLC,*
    2026 WL 772359 (W.D. Tex. Feb. 5, 2026) ............................................................ 27

*Gonzales v. Cordoba Legal Grp., LLC,*
    2026 WL 790575 (W.D. Tex. Feb. 21, 2026) .......................................................... 27

*Gresham v. Town of Depew, Oklahoma,*
    2025 WL 752337 (10th Cir. Mar. 10, 2025) ........................................................... 25

*Hirsch v. USHealth Advisors, LLC,*
    337 F.R.D. 118 (N.D. Tex. 2020) ............................................................................ 29

*In re Crocs, Inc. Sec. Litig.,*
    774 F. Supp. 2d 1122 (D. Colo. 2011) ....................................................................... 4

*In re DISH Network, LLC,*
    28 FCC Rcd. 6574 (2013) ........................................................................................ 18

v

*In re Rare, LLC,*
    298 B.R. 762 (Bankr. D. Colo. 2003) ................................................................ 21, 22

*In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.,*
    223 F. Supp. 3d 514 (N.D. W.Va. 2016) ........................................................... 22, 24

*Irvin v. Sonic Indus. Servs., LLC,*
    2026 WL 1098403 (N.D. Ga. Apr. 20, 2026) ......................................................... 29

*Jones v. Blackstone Med. Servs., LLC,*
    792 F. Supp. 3d 894 (C.D. Ill. 2025)...................................................................... 29

*Jones v. Royal Admin. Servs., Inc.,*
    887 F.3d 443 (9th Cir. 2018) .................................................................................. 22

*Kern v. VIP Travel Servs.,*
    2017 WL 1905868 (W.D. Mich. May 10, 2017) ................................................ 22, 24

*Keymark Enters., LLC v. Eagle Metal Prods.,*
    2008 WL 4787590 (D. Colo. Oct. 30, 2008) .......................................................... 17

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ............................................................................................... 18

*Martinez v. City of Aurora, Colorado,*
    --- F.4th ---, 2026 WL 1130240, at *6-7 (10th Cir. Apr. 27, 2026) ....................... 20

*Master Commodities, Inc. v. Texas Cattle Mgmt. Co.,*
    586 F.2d 1352 (10th Cir. 1978) ............................................................................. 25

*McCafferty v. Preiss Enters., Inc.,*
    534 F. App'x 726 (10th Cir. 2013) ......................................................................... 26

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) ................................................................................. 28

*Michael M. v. Nexsen Pruet Grp. Med. & Dental Plan,*
    2018 WL 1406600 (D. Utah Mar. 19, 2018)........................................................... 16

*Mogck v. United Wholesale Mortgage, LLC,*
    No. 2:26-cv-10733 (E.D. Mich. filed March 3, 2026) .............................................. 7

*Moore v. Charter Commc'ns, Inc.,*
    523 F. Supp. 3d 1046 (N.D. Ill. 2020) ................................................................... 27

*N.T. v. Taco Bell Corp.*,
  411 F. Supp. 3d 1192 (D. Kan. 2019) ................................................................. 22

*New Millennium Consulting, Inc. v. United HealthCare Servs., Inc.*,
  695 F.3d 854 (8th Cir. 2012) ............................................................................. 21

*Potter Voice Techs. LLC v. Apple, Inc.*,
  2013 WL 1333483 (D. Colo. Mar. 29, 2013) .................................................. 12, 13

*Randleman v. Fid. Nat. Title Ins. Co.*,
  646 F.3d 347 (6th Cir. 2011) ............................................................................. 28

*Roehrman v. McAfee, LLC*,
  758 F. Supp. 3d 889 (S.D. Ind. 2024) ................................................................ 27

*Selou v. Integrity Sol. Servs. Inc.*,
  2016 WL 612756 (E.D. Mich. Feb. 16, 2016) ..................................................... 19

*Sheldon v. Khanal*,
  605 F. Supp. 2d 1179 (D. Kan. 2008) ................................................................ 14

*Smith v. Direct Bldg. Supplies, LLC*,
  2021 WL 4623275 (E.D. Pa. Oct. 7, 2021) ......................................................... 18

*Smith v. United States*,
  561 F.3d 1090 (10th Cir. 2009) ....................................................................... 3, 5

*Thomas v. Taco Bell Corp.*,
  879 F. Supp. 2d 1079 (C.D. Cal. 2012) .............................................................. 22

*TL Enters. v. Haes Contr., Inc.*,
  2012 WL 940348 (D. Kan. Mar. 20, 2012) ......................................................... 15

*Toney v. Quality Res., Inc.*,
  75 F. Supp. 3d 727 (N.D. Ill. 2014) ................................................................. 5, 27

*Usanovic v. Americana, L.L.C.*,
  775 F. Supp. 3d 1133 (D. Nev. 2025) ................................................................ 20

*VDARE Found. v. City of Colorado Springs*,
  11 F.4th 1151 (10th Cir. 2021) .......................................................................... 10

*Waite v. Compass Mins. Am.*,
  2025 WL 3525030 (D. Kan. Dec. 9, 2025) .......................................................... 11

*Wake Energy, LLC v. Mustang Fuel Corp.*,
    2023 WL 2958255 (E.D. Okla. Feb. 15, 2023) ....................................................... 11

*Whetstone Candy Co. v. Kraft Foods, Inc.*,
    351 F.3d 1067 (11th Cir. 2003) ............................................................................ 20

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ................................................................................ 28

**Statutes**

28 U.S.C. § 1391................................................................................................................ 11

28 U.S.C. § 1404......................................................................................................... x, 9, 10

47 C.F.R. § 64.1200......................................................................................................... 6

47 U.S.C. § 227......................................................................................................... x, 1, 18

**Rules**

E.D. Mich. L.R. 83.11.................................................................................................... 15

Fed. R. Evid. 408.......................................................................................................... 3

Fed. R. Civ. P. 12 .................................................................................................. 2, 4, 10

Fed. R. Civ. P. 45 ............................................................................................................ 12

**Other Authorities**

https://law.lexmachina.com/ (last accessed May 14, 2026) ....................................... 15

Restatement (Third) of Agency § 2.03................................................................. 21, 24

## STATEMENT OF ISSUES PRESENTED

1.   Whether the Court should transfer this action to the United States District Court for the Eastern District of Michigan under 28 U.S.C. § 1404(a) because: (a) this action could have been brought in Michigan; (b) the overwhelming majority of relevant party and non-party witnesses and documents are located in Michigan; (c) key nonparty witnesses are subject to compulsory process in Michigan but not in Colorado; (d) related putative class actions involving overlapping allegations and issues are already pending in Michigan; and (e) transfer therefore would best serve the convenience of the parties and witnesses and the interest of justice.

    Defendant's Answer:    Yes.

2.   Whether the First Amended Complaint ("FAC") fails to state a plausible claim of direct liability under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), where no plausible, non-conclusory facts indicate that UWM "initiated" any of the telephone calls at issue, as required by statute, and the 10-K records indicate that UWM itself does not place calls to potential borrowers.

    Defendant's Answer:    Yes.

3.   Whether the FAC fails to state a plausible claim of vicarious liability based on actual authority where UWM's standard broker contract disclaims an agency relationship, requires brokers to comply with applicable law, prohibits them from representing that they are UWM's agents or using UWM's name in advertising, and the FAC alleges no facts showing that UWM authorized the allegedly unlawful calls or controlled the brokers' day-to-day activities.

    Defendant's Answer:    Yes.

4.   Whether the FAC fails to state a plausible claim of vicarious liability based on apparent authority where any supposed appearance of authority arises solely from the brokers' own statements rather than from manifestations of authority by UWM, and where Plaintiff does not allege that she viewed or relied on any conduct or statements by UWM.

    Defendant's Answer:    Yes.

5.   Whether the FAC fails to state a plausible claim of vicarious liability based on ratification where Plaintiff does not allege that UWM accepted and retained

x

any benefit of unlawful communications with full knowledge of such communications, both of which are required to establish ratification.

Defendant's Answer:                     Yes.

6.     Whether the class allegations in the FAC should be stricken at the pleadings stage under Rule 12(f) because, on the face of the Complaint, both the proposed Do Not Call Registry Class and the Stop Request Class are impermissibly fail-safe in that class membership depends on merits determinations as to whether: (a) UWM is directly or vicariously liable for the calls; and (b) the communication constitutes a "telephone call" under 47 U.S.C. § 227(c)(5).

Defendant's Answer:                     Yes.

x

## I.    <u>INTRODUCTION</u>

Plaintiff's First Amended Complaint ("FAC") seeks to hold Defendant United Wholesale Mortgage ("UWM") vicariously liable under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), for calls made by unidentified independent mortgage brokers without any facts suggesting that UWM authorized or ratified the calls. Based on the facts as alleged in the FAC, Plaintiff's theory of TCPA liability is factually unsupported and legally untenable.

But this Court does not have to rule on these issues. Rather, the Court should transfer this case to the U.S. District Court for the Eastern District of Michigan (the "Michigan Court"), where two other putative class actions against UWM assert virtually identical allegations, theories, and proposed classes. Both actions (one filed by Plaintiff's own counsel) are procedurally further ahead. As the Supreme Court has long held, "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960). Transfer to Michigan would permit consolidation of cases, reduce discovery redundancies, and promote judicial efficiency. Transfer would also serve the convenience of the parties and witnesses and be in the interest of justice under 28 U.S.C. § 1404(a) because virtually all relevant witnesses and documents are located in Michigan, and the key nonparty witnesses are subject to compulsory process only in Michigan.

If the Court transfers the case to the Michigan Court, it need not rule on the remaining arguments. Even if the Court decides against the transfer, however, the FAC fails to state a claim under both direct and vicarious liability theories. The direct-liability claim fails because the FAC alleges no facts showing that UWM itself initiated any call; rather, the FAC suggests that an independent mortgage broker made the calls. In addition, UWM's 10-K confirms that UWM does not engage in outreach to potential consumers.

The FAC also fails to plausibly allege vicarious liability. It does not establish actual authority. Indeed, UWM's Broker Agreement—properly considered on this Motion to Dismiss—disclaims any agency relationship. The Agreement bars use of UWM's name without UWM's consent, does not require brokers to originate any loans for UWM, and does not require brokers to place any calls for UWM. And the FAC does not allege that UWM controlled brokers' daily operations or directed the calls at issue.

The FAC does not establish apparent authority because any belief that the callers acted for UWM rests solely on their own statements, not on any manifestation by UWM, and Plaintiff alleges no reliance on any conduct or statements by UWM. Nor does the FAC establish ratification because UWM lacked knowledge of the calls before receiving any benefit, and because it never closed a loan with Plaintiff or otherwise benefitted from the calls at issue.

Finally, the proposed class definitions should be stricken under Rule 12(f) as fail-safe. The class membership is defined by whether: (a) "Defendant or anyone acting

2

on Defendant's behalf" made the calls; or (b) the communication constitutes a "telephone call" under § 227(c)(5). Both are merits determinations that exclude non-prevailing claims from the class. Courts routinely strike such classes.

## II.    <u>FACTUAL BACKGROUND</u>

***The Calls.*** The FAC alleges that between September 24 and December 10, 2025, Plaintiff, a Colorado resident, received multiple calls to her phone number registered on the National Do Not Call Registry. (FAC ¶¶ 46-53.) One or more "live representatives" placed the calls, intending to speak with "Andrew" or "Mr. or Mrs. Maler" to help "Andrew" get a better mortgage rate. (*Id.* ¶¶ 47, 53.)

The FAC alleges that, on November 7, 2025, Plaintiff sent UWM a letter complaining about the calls (the "November Letter"). (*Id.* ¶ 54.) In this Letter, Plaintiff advised that the callers were trying to reach Andrew and/or Mr. or Mrs. Maler, who are not "at this number." (*Id.*; *see also* Ex. 1, November Letter.[1]) Plaintiff also noted in the Letter that she had told the callers "they were calling a number ***in COLORADO not Michigan***"—suggesting Plaintiff understood the calls to be intended for Michigan residents. (Ex. 1, November Letter, emphasis added.) The Letter made a monetary demand to UWM to resolve Plaintiff's claims.[2]

---

[1] The Court may consider this Letter because it is a "document[] incorporated into the complaint by reference." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).
[2] Although the Letter serves as a settlement negotiation, Rule 408 does not "require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1531 (D. Colo. 1993) (quoting Fed. R. Evid. 408). The Letter is redacted to exclude the substance of Plaintiff's settlement demand.

The Letter did not identify the callers, but Plaintiff, who had spoken with the callers live, described the calls as "Phone Calls *from MI*." (*Id.*, emphasis added.) All numbers had Michigan area codes, and each was unique. (*Id.*) The FAC alleges 14 additional calls "from or on behalf of" UWM after the Letter, but does not identify when they were made and whether they involved the same callers. (FAC ¶ 56.)

*UWM's Business Model.* UWM is a wholesale mortgage lender with an "exclusive focus on the wholesale channel" and "substantially all of [its] operations" and headquarters on "one campus in Pontiac, Michigan." (Ex. 2, UWM 2025 Annual 10-K Report ("10-K"), pp. 6, 24, 38.)[3] Unlike retail lenders, which sell loans to consumers directly, UWM works with independent mortgage broker clients, who "have the initial communication with a potential borrower." (*Id.* at pp. 5, 7, 17; FAC ¶¶ 10, 30.) These brokers act as advisors for consumers, comparing rates and products from multiple lenders. (*Id.* at pp. 5, 7, 17.) They are licensed professionals representing the borrower and they are not obligated to submit any minimum number of loan applications to UWM. (Ex. 3, Broker Agr. ¶ 7.03; *see also id.*, Recitals.)[4] The broker's relationship with UWM is not exclusive. (*Id.* ¶¶ 3.03(x), 7.03.)

---

[3] The Court may take judicial notice of publicly available information, like annual reports, for purposes of this Motion to Dismiss. *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1143 n.3 (D. Colo. 2011).

[4] The Broker Agreement may also be considered under Rule 12(b)(6) because it is central to Plaintiff's claims and was repeatedly referenced in the FAC, which contains a section regarding "Defendant's relationship with its broker agents," and asserts that UWM "outsourc[ed] telemarketing," "expressly authorizes its brokers to sell Defendant's mortgage products over the phone" and "prohibits its brokers from submitting loans to Defendant's major competitors." (FAC ¶¶ 29, 30, 35.) *Smith*, 561

4

The Agreement does not allow brokers to make any calls on behalf of UWM.

UWM's clients include over 13,000 independent mortgage broker businesses and 57,000 associated independent mortgage loan officers nationwide. (Ex. 2, 10-K, at p. 6.) All brokers with a business relationship with UWM must sign a Wholesale Broker Agreement, which states that broker clients are ***independent contractors*** and ***not UWM's agents***. (Ex. 3, Broker Agr. ¶ 7.04.) The Broker Agreement expressly forbids brokers from holding themselves out as UWM's agents, representatives, or affiliates. (*Id.*) Although the FAC alleges UWM "authorizes its brokers to sell [UWM's] mortgage products over the phone" (FAC ¶¶ 10, 30), nothing in the Broker Agreement permits brokers to place any calls or text messages on UWM's behalf. Indeed, the UWM Broker Agreement affirmatively prohibits brokers' use of UWM's name in marketing without prior written consent (Ex. 3, Broker Agr. ¶ 7.11) and requires compliance with applicable laws and regulations (*id.* ¶ 3.03).

***UWM's Tools and Support.*** Plaintiff alleges that UWM provides mortgage broker clients with access to training resources and certain tools and resources. (FAC ¶¶ 31-39.) Plaintiff further alleges that UWM tracks broker performance metrics. (*Id.*

---

F.3d at 1098; *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 732 n.2 (N.D. Ill. 2014) (considering at the 12(b)(6) stage an agreement central to TCPA allegations). And although Plaintiff alleges that UWM bars brokers from submitting loans to its "major competitors," the Broker Agreement in fact prohibits submission only to Rocket Mortgage and Fairway Independent Mortgage. (Ex. 3, Broker Agr. ¶ 3.03(x).) In the crowded residential mortgage origination market, and in light of the Agreement's explicit provision not requiring brokers to submit any minimum number of loans through UWM, this limited restriction does not create a requirement that the broker submit applications exclusively to UWM.

¶ 40.) However, the FAC does not allege that UWM provided Plaintiff's number to the brokers at issue, that UWM directed the brokers to place any of the calls at issue, or that the brokers who called Plaintiff even knew of UWM's tools, let alone utilized them to call Plaintiff.

The FAC also alleges that UWM maintains a public-facing website— mortgagematchup.com—to allow borrowers to connect with local mortgage brokers. (*Id.* ¶ 41.) Again, the FAC does not allege that Plaintiff was aware of this website or ever accessed this website. Nor does (or can) the FAC suggest that the website was limited to only brokers affiliated with UWM.

***Plaintiff's Claims.*** The FAC asserts two causes of action under the TCPA regulations: (1) claim under the TCPA Do-Not-Call ("DNC") regulations, *see* 47 C.F.R. § 64.1200(c), alleging that UWM solicited individuals who registered their numbers in the DNC Registry; and (2) claim under the TCPA internal DNC regulations, *see* 47 C.F.R. § 64.1200(d), alleging that UWM failed to honor plaintiffs' opt-out requests and failed to maintain appropriate policies and procedures. Plaintiff proposes two nationwide classes defined by reference to calls that UWM "or anyone acting on [its] behalf" initiated:

> **Do Not Call Registry Class:** Each person in the United States: (1) to whose non-commercial telephone number ***Defendant or anyone acting on Defendant's behalf*** initiated two or more ***telephone solicitations*** during a 12-month period; (2) promoting Defendant's service for sale (3) where the person's telephone number was registered on the National Do Not Call Registry more than thirty-one days before the telephone solicitations; (4) at any time from four years before the date this Complaint was filed through trial.

<u>**Stop Request Class:**</u> Each person in the United States to whose (1) non-commercial telephone number (2) ***Defendant or anyone acting on Defendant's behalf*** initiated two or more ***telephone solicitations*** during a 12-month period (3) promoting Defendant's services for sale (4) at least 7 days after receipt of a do not call request (5) at any time from four years before the date this Complaint was filed through trial. (FAC ¶ 63, emphasis added.)

***Procedural History.*** Plaintiff filed her initial Complaint on February 4, 2026. (ECF No. 1.) On March 31, 2026, UWM moved to dismiss the initial Complaint for lack of personal jurisdiction and failure to state a claim and separately moved to transfer the case to the Eastern District of Michigan. (ECF Nos. 17, 19.) In response, Plaintiff amended her Complaint, adding allegations regarding "Defendant's relationship with its broker agents." (FAC ¶¶ 30-43.) These allegations are virtually identical to the allegations in another putative class action filed by Plaintiff's counsel against UWM in Michigan. *Mogck v. United Wholesale Mortgage, LLC*, No. 2:26-cv-10733 (E.D. Mich. filed March 3, 2026), ECF No. 1, ¶¶ 24-36.

***Recent TCPA Cases Against UWM in Michigan.*** UWM is a defendant in two putative TCPA class actions filed in the Michigan Court with overlapping allegations, theories, and classes, including one brought by Plaintiff's counsel:

| *Case* | *McGonigle v. UWM*, No. 25-13865 (E.D. Mich.) | *Warne v. UWM*, No. 26-00424 (D. Colo.) | *Mogck v. UWM*, No. 26-10733 (E.D. Mich.) |
|---|---|---|---|
| **Parties** | Andrew McGonigle (a Virginia resident) & Joshua Hester (a Florida resident)<br>Defendant: UWM | Bridget Warne<br><br><br><br>Defendant: UWM | William Mogck (a Texas resident)<br><br>Defendant: UWM |
| **Plaintiff's** | Paronich Law | Keogh Law | Keogh Law |

7

| Counsel | | | |
|---|---|---|---|
| **Defendant's Counsel** | Foley & Lardner | Foley & Lardner | Foley & Lardner |
| **Date filed** | December 2, 2025 | February 17, 2026 | March 3, 2026 |
| **Procedural Posture** | UWM filed Motion to Dismiss and Strike Class Allegations on 1/16/2026; Plaintiff filed First Amended Complaint ("FAC"); UWM filed renewed Motion to Dismiss FAC and Strike Class Allegations on 4/23/26, and Plaintiffs filed a response on 5/12/26. | UWM filed Motion to Dismiss Original Complaint and Motion to Transfer the Case to Michigan on January 16, 2026; Plaintiff filed FAC; UWM files this consolidated Motion to Dismiss and Strike Class Allegations, or Transfer Venue | UWM filed Motion to Dismiss and Strike Allegations on 4/27/26 |
| **Claims** | 1. National DNC Registry violations (47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c))<br><br>2. Internal DNC list procedure violations (stop requests) (47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d))<br><br>3. Virginia Telephone Privacy Protection Act ("VTPPA") – National DNC Registry violations (Va. Code Ann. § 59.1-514(B)) | 1. National DNC Registry violations (47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c))<br><br>2. Internal DNC list procedure violations (stop requests) (47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d)) | 1. National DNC Registry violations (47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c))<br><br>2. Internal DNC list procedure violations (stop requests) (47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d)) |
| **Vicarious liability?** | Yes | Yes | Yes |
| **Proposed classes** | *DNC Registry Class*: nationwide class consisting of everyone to whom UWM delivered or "caused to be delivered" | *DNC Registry Class*: nationwide class consisting of everyone to whom UWM "or anyone on its behalf" | *DNC Registry Class*: Same as in *Warne* |

| | telephone messages in violation of § 64.1200(c) | initiated telephone messages in violation of § 64.1200(c) | |
| --- | --- | --- | --- |
| | *Internal DNC Class*: nationwide class consisting of everyone who received telephone messages from "or on behalf of" UWM, in violation of § 64.1200(d).[5] | *Stop Request Class*: nationwide class consisting of everyone to whom UWM or anyone on its behalf initiated telephone messages in violation of § 64.1200(d) | *Stop Request Class*: Same as in *Warne* |

## III.    <u>STANDARD OF REVIEW.</u>

***Transfer Under § 1404(a) (Inconvenient Venue).*** Federal law provides three ways to transfer a case between districts. If the forum court lacks personal jurisdiction, the proper route is transfer under 28 U.S.C. § 1631. If venue in the forum court is improper, transfer may occur under 28 U.S.C. § 1406(a). Finally, § 1404(a) allows for transfer even where the original venue is proper "[f]or the convenience of the parties and witnesses [and] in the interest of justice." 28 U.S.C. § 1404(a); *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62-63 (2013). UWM moves for transfer pursuant to § 1404(a).

There are nine discretionary factors that guide § 1404(a) analysis:

[1] the plaintiff's choice of forum; [2] the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; [3] the cost of making the necessary proof; [4] questions as to the enforceability of a judgment if one is obtained; [5] relative advantages and obstacles to a fair trial; [6] difficulties that may arise from congested dockets; [7] the possibility of the existence of questions arising in the area of conflict of laws; [8] the

---

[5] The *McGonigle* Plaintiffs also propose a VTPPA Sub-Class.

9

advantage of having a local court determine questions of local law; and [9] all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010).

***Failure to State a Claim.*** To avoid dismissal under Rule 12(b)(6), a complaint must allege facts creating a "plausible inference" of legally cognizable harm. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Courts "need not accept as true a complaint's conclusory allegations, unwarranted inferences, or legal conclusions." *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1210 (10th Cir. 2025). Allegations "merely consistent with" liability "stop short of the line between possibility and plausibility." *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021).

***Motion to Strike.*** Under Rule 12(f), the Court "may grant a motion to strike class allegations where the pleading makes clear that the purported class cannot be certified and no amount of discovery would change that determination." *Faulhaber v. Petzl Am., Inc.*, 656 F. Supp. 3d 1257, 1271 (D. Colo. 2023). "One reason that a court may strike class allegations is that the proposed class, as defined by the plaintiff, is "fail-safe," i.e., it defines its membership in terms of the defendant's liability." *Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38, 39-40 (D. Mass. 2022) (collecting cases).

## IV.    TRANSFER IS PROPER UNDER 28 U.S.C. § 1404(A).

This Court should transfer this case to the Michigan Court under 28 U.S.C. §

10

1404(a), which permits transfer "[f]or the convenience of parties and witnesses" and "in the interest of justice." This action could have been brought there in the first place because UWM resides in Michigan and a substantial part of the events giving rise to Plaintiff's claims occurred there. *See* 28 U.S.C. § 1391(b)(1)–(2). As explained below, virtually all of the § 1404(a) factors favor transfer, and none weigh against it.

1. ***Plaintiff's Choice of Forum.*** Although the plaintiff's "choice of forum should rarely be disturbed," when a plaintiff serves as a class representative, "that weight is diminished and factors other than plaintiff's choice must necessarily take on increased significance." *Waite v. Compass Mins. Am.*, 2025 WL 3525030, at *2 (D. Kan. Dec. 9, 2025); *Wake Energy, LLC v. Mustang Fuel Corp.*, 2023 WL 2958255, at *3 (E.D. Okla. Feb. 15, 2023). That weight becomes even more diminished where, as here, "many of the [putative] class members reside over a large area far removed from the forum plaintiff has chosen." *Donnelly v. Klosters Rederi A/S*, 515 F. Supp. 5, 6 (E.D. Pa. 1981).[6]

2. ***Accessibility of Witnesses/Proof & Availability of Compulsory Process.*** UWM is headquartered in Michigan, where "substantially all of [UWM's] operations are housed." (Ex. 2, 10-K, at pp. 24, 38.) UWM is organized under Michigan law, and UWM issued no loan to Plaintiff. (FAC ¶¶ 7, 61.) As discussed below,

---

[6] Notably, transfer would not require Plaintiff to switch counsel because Plaintiff's counsel has filed another similar putative class action against UWM in the Michigan Court (*Mogck*), involving a plaintiff who is a resident of Texas. Indeed, Plaintiff herself arguably falls within the proposed classes in that action.

vicarious liability turns on the acts of the principal—allegedly UWM. This means that most of the evidence relevant to Plaintiff's theory of vicarious liability, and the key witnesses that can testify to that, will be UWM employees located in Michigan.

Additionally, "[i]n analyzing the accessibility of witnesses, the convenience of non-party witnesses weighs more heavily than the convenience of parties and their employees." *Potter Voice Techs. LLC v. Apple, Inc.*, 2013 WL 1333483, at *2 (D. Colo. Mar. 29, 2013); *Bovino v. Incase Designs Corp.*, 2014 WL 1796914, at *2 (D. Colo. May 6, 2014) (same). Here, Plaintiff understood the callers and the intended recipients of the calls to be located in Michigan. (Ex. 1, November Letter.) Virtually all calls came from Michigan area codes. (Ex. 1, at p. 2.) While Plaintiff alleges that these calls were spoofed (FAC ¶¶ 59-60), Plaintiff, who spoke with the brokers several times, represented to UWM in her November Letter that the calls were "from MI", and that the callers were trying to reach Michigan residents—the Malers—but mistakenly called a Colorado number. (Ex. 1.) Indeed, Plaintiff herself cites the Michigan-Colorado mismatch as evidence that the calls were misdirected. (*Id.* at 1 ("I also pointed out that they were calling a number in COLORADO not Michigan.").) Taken together, the geographic consistency, the callers' stated purpose, and Plaintiff's own characterization support an inference that the calls originated from Michigan. The FAC offers zero facts to suggest that the callers or intended recipients were in Colorado.

The third-party brokers who made the calls are likely witnesses subject to

12

discovery and potentially trial subpoenas in Michigan. But if the case remains in Colorado, and because nothing suggests the callers are located there, they would likely fall outside Colorado's subpoena power because they are "beyond 100 miles" from the courthouse. *Bailey v. Union Pac. R.R.*, 364 F. Supp. 2d 1227, 1231 (D. Colo. 2005) (citing Fed. R. Civ. P. 45(b)(2)). Although UWM has a registered agent in Colorado, Plaintiff does not allege that the agent was involved in the conduct at issue. Its presence therefore carries no weight. *See Camarena v. Vanderbilt Mortg. & Fin., Inc.,* 2015 WL 4036258, at *3 (N.D. Ill. July 1, 2015) (resident agent in the state not relevant to the transfer analysis under § 1404(a) in the context of TCPA violations).

3. *The Cost of Making Necessary Proof.* The proof central to Plaintiff's claims is all in Michigan. According to Plaintiff's November Letter, the calls came "from MI" (i.e., from Michigan), originated from Michigan numbers, and were intended for Michigan residents. UWM's relationship with the mortgage brokers is governed by a contract interpreted under Michigan law and subject to the forum selection provision requiring any litigation to be brought in Michigan. (Ex. 3, Broker Agr. § 7.15.) This factor favors transfer when "it would be more expensive for several [defendant] witnesses to travel to Colorado for trial than it would be for [plaintiff's] one witness … to travel to" another state for trial. *Potter Voice Techs. LLC v. Apple, Inc.*, 2013 WL 1333483, at *3 (D. Colo. Mar. 29, 2013). That would certainly be the case here. *Id.; see also Anza Tech., Inc. v. Xilinx, Inc.*, 2017 WL 4864947, at *4 (D. Colo. Oct. 27, 2017) (where majority of witnesses and documents were located in

13

California and only five potential witnesses in Colorado, this factor weighed in favor of transfer to California).

**4.** ***Questions As to Enforceability of Judgment.*** Generally, judgments obtained in federal court may be enforced in any other federal court. *Anza Tech., Inc.*, 2017 WL 4864947, at *5. That said, UWM is based in Michigan, and most of its assets are located there. (Ex. 2, at 10-K, at pp. 24, 38.) Thus, even if Plaintiff obtained a judgment against UWM, she would likely need to execute on property located outside this Court's jurisdiction to enforce the judgment. *ConocoPhillips Co. v. Jump Oil Co.*, 948 F. Supp. 2d 1272, 1286 (N.D. Okla. 2013) (finding that the fourth factor weighed in favor of transfer based on this rationale); *Sheldon v. Khanal*, 605 F. Supp. 2d 1179, 1189 (D. Kan. 2008) (finding transfer proper under § 1404(a) where, among other factors, "any judgment which plaintiffs obtain will likely be enforced in New York.") Thus, this factor, too, weighs in favor of transfer.

**5.** ***Relative Advantages And Obstacles To A Fair Trial.*** Generally, all federal courts are "equally capable of providing a fair trial." *Brumate, Inc. v. Walmart Inc.*, 2023 WL 3602327, at *4 (D. Colo. May 23, 2023). But if this case stayed in this District, UWM would face significant obstacles to a fair trial due to its inability to: (a) implead out-of-state third parties responsible for the calls (i.e., the brokers who originated the calls to Plaintiff's number); (b) obtain discovery from key witnesses— both the brokers and the intended recipients of the calls, most of whom are out of state; and (c) require out-of-state key witnesses' attendance at trial. Finally, should

14

UWM be compelled to seek indemnification against any third-party broker, such action must be brought in Michigan. (Ex. 3, Broker Agr. § 7.15.) By contrast, none of these obstacles are present if the case were to be transferred to Michigan. Plaintiff's counsel recognized this when he filed the *Mogck* class action against UWM in Michigan, even though the named Plaintiff was based in Texas. These obstacles weigh distinctly in favor of the transfer of this case to Michigan. *See TL Enters. v. Haes Contr., Inc.*, 2012 WL 940348, at *6 (D. Kan. Mar. 20, 2012) ("[T]his Court's lack of subpoena power over potential witnesses tips this factor in favor of transfer.").

**6. *Difficulties From Congested Dockets.*** "When evaluating the administrative difficulties of court congestion, the most relevant statistics are the median time from filing to disposition, median time from filing to trial, pending cases per judge, and average weighted filings per judge." *Employers Mut. Cas. Co.*, 618 F.3d at 1169. The congestion levels of this District and the Michigan Court are similar.[7] But this case unnecessarily clogs this District's dockets. If transferred, the three cases could be consolidated. At a minimum, this case would be assigned to the same judge handling the *Mogck* matter filed by the same Plaintiff's counsel under the Michigan Court's companion case policy. *See* E.D. Mich. L.R. 83.11(b)(7). This would make

---

[7] The median time from filing to disposition in the Michigan Court is 244 days; the same metric is a comparable 210 days in this District. The median time from filing to trial in the Michigan Court is 712 days; the same metric is 798 days in this District. As of the date of this filing, the average number of pending cases per judge in the Michigan Court is approximately 155, while that same metric is approximately 156 in this District. These metrics were obtained from Lex Machina during the drafting of this Motion. https://law.lexmachina.com/ (last accessed May 14, 2026).

15

resolution much more expedient. The first of the three virtually identical TCPA cases has been pending since December 2025, and both Michigan cases are procedurally more advanced, as UWM has already filed motions to dismiss the other two pending cases, and Plaintiffs have already filed an opposition in the first case. The Court handling those cases would be up to speed on the arguments, making resolution quicker. And if UWM were required to pursue indemnification from any third parties who made the calls, that action would have to be brought in Michigan. (Ex. 3, Broker Agr. § 7.15.) If this case remained in Colorado, that would necessitate a separate lawsuit in Michigan. By contrast, if the case were transferred to Michigan, claims against the third parties who placed the calls could be made as part of the same action, in front of the same judge familiar with the basic facts and theories.

**7. *Conflict of Laws Questions.*** This is a federal question case involving application of federal TCPA law, "so questions arising in the area[] of conflicts of law … will not occur in this case." *Michael M. v. Nexsen Pruet Grp. Med. & Dental Plan*, 2018 WL 1406600, at *6 (D. Utah Mar. 19, 2018). This factor is thus neutral.

**8. *The Advantage of Having Local Court Determine Questions of Local Law.*** In the event that a UWM broker client is brought into this action, the Broker Agreement would become central to the claims. The UWM Broker Agreement, which governs the relationship between UWM and its broker clients, is expressly governed by Michigan law. (UWM Broker Agr. § 7.15.) It further provides that any disputes about the meaning of the Agreement—including any agency implications flowing

16

from the Agreement—must be resolved in Michigan. (*Id.*) Thus, this factor weighs in favor of transfer to the Michigan Court for that court to interpret and decide issues of Michigan law. *See Keymark Enters., LLC v. Eagle Metal Prods.*, 2008 WL 4787590, at \*8 (D. Colo. Oct. 30, 2008) (where contract "provides that Texas law controls," questions of Texas law "will predominate," weighing in favor of transfer).

9. ***Other Considerations That Make a Trial Easy, Expeditious, and Economical.*** Other practical considerations to make a trial easy, expeditious, and economical overwhelmingly favor transfer to Michigan, where two other putative class actions against UWM are pending, arising out of similar allegations, and one was even initiated by Plaintiff's counsel. "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Cont'l Grain Co.*, 364 U.S. at 26; *Black v. Sprouts Farmers Market, Inc.*, 2015 WL 7351511, at \*3 (D. Colo. Nov. 19, 2015) (same). So too here. The two Michigan lawsuits and this action involve near-identical questions of vicarious liability under the TCPA and either identical (*Mogck*) or very similar (*McGonigle*) proposed classes (*see* chart on pp. 7-9 *supra*). Accordingly, they will involve much of the same evidence and testimony. Transfer would also allow relevant third-party brokers to be joined in the same action, if appropriate, rather than forcing UWM to litigate overlapping issues in yet another separate case in a different state. Requiring this Court to proceed on a separate track would lead to the "wastefulness of time,

17

energy and money that § 1404(a) was designed to prevent." *Id.*

## V.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM.

To state a direct liability claim under the TCPA, Plaintiff must allege that

UWM "initiated" the calls—that is, took "the steps necessary to physically place a

telephone call." *Connor v. Servicequick Inc.*, 2025 WL 2855393, at *3 (D. Colo. Oct. 8,

2025). The TCPA appears to contemplate vicarious liability. Section 227(c)(5) allows

relief for violations of DNC Provisions if a person received an offending call "***on***

***behalf of*** the same entity." 47 U.S.C. § 227(c)(5) (emphasis added). Courts have

interpreted this language to permit vicarious liability based on federal common law

agency principles of actual authority, apparent authority, or ratification.[8] *Escano v.*

*Concord Auto Protect, Inc.*, 2023 WL 4247703, at *3 (10th Cir. June 29, 2023);

*DeClements v. RE/MAX LLC*, 2020 WL 9259326, at *3 (D. Colo. Oct. 13, 2020).

### A.    The FAC Fails To State A Direct Liability Claim.

To plead direct TCPA liability, Plaintiff must "support [her] conclusion" that

UWM placed the calls. *Smith v. Direct Bldg. Supplies, LLC*, 2021 WL 4623275, at *3

(E.D. Pa. Oct. 7, 2021). The FAC fails to do so. Although it states that the callers

---

[8] To be sure, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ended judicial deference to FCC interpretations, including the FCC ruling on vicarious liability. *See In re DISH Network, LLC*, 28 FCC Rcd. 6574 (2013). Still, post-*Loper Bright* decisions have found the direct/vicarious liability framework sound based on the "by or on behalf of" language in 47 U.S.C. § 227(c)(5). *See, e.g., Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 213 (S.D.N.Y. 2024). Although some notion of vicarious liability exists under the TCPA, the FCC pronouncements on this issue are no longer entitled to deference and have to be scrutinized for consistency with the statute's language.

claimed to be calling "from [UWM]" (FAC ¶¶ 46–52, 77), elsewhere the FAC concedes that the calls were placed by a "UWM broker" or "others acting on [UWM's] behalf." (FAC ¶¶ 24–29, 61, 77-78.)

Moreover, given that UWM is a wholesale broker that does not engage in direct outreach to consumers (Ex. 2, 10-K, at pp. 5, 7, 17) and that instead "Independent Mortgage Brokers … have the initial communication with a potential borrower" (*Id.* at p. 7), it is implausible that UWM itself initiated the calls. Such conclusory statements that defendant placed the calls, without supporting facts, cannot give rise to direct liability.[9]

## B.    The FAC Fails To State A Vicarious Liability Claim.

To state a vicarious liability claim, Plaintiff must plausibly allege that UWM granted actual or apparent authority to make those calls or later ratified the callers' conduct. *Coreslab Structures (TULSA), Inc. v. Nat'l Lab. Rels. Bd.*, 100 F.4th 1123, 1136-38 (10th Cir. 2024). Plaintiff cannot make that showing here. Courts routinely dismiss such factually unsupported claims of vicarious liability. *See Selou v. Integrity Sol. Servs. Inc.*, 2016 WL 612756, at *5 (E.D. Mich. Feb. 16, 2016) (vicarious liability claim fails where the complaint did not plead fact*s* that allow court to draw the reasonable inference that defendant is vicariously liable for the misconduct);

---

[9] *See Bank v. Spark Energy, LLC*, 860 F. App'x 205, 206 (2d Cir. 2021) (dismissing TCPA claim where plaintiff alleged defendant initiated calls but offered no supporting details); *Donaca v. Dish Network, LLC*, 303 F.R.D. 390, 396 (D. Colo. 2014) (dismissing direct liability claims where plaintiffs presented no evidence that defendant placed the calls).

*Usanovic v. Americana, L.L.C.*, 775 F. Supp. 3d 1133, 1141-42 (D. Nev. 2025) (same).

### 1. The FAC Fails To Plausibly Allege Actual Authority.

"An agent acts with actual authority if it reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013). Actual authority thus requires three elements: "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003); *Martinez v. City of Aurora, Colorado,* --- F.4th ---, 2026 WL 1130240, at *6-7 (10th Cir. Apr. 27, 2026) (similar definition of agency). Plaintiff fails to plausibly allege that UWM authorized brokers to act as its agents. Quite to the contrary, UWM's Broker Agreement, which is incorporated into the FAC by reference, (*see* n.4 *supra*), expressly states that brokers are independent contractors and ***not UWM agents***, and the Agreement prohibits brokers from using UWM's name in marketing without written approval. (Ex. 3, Broker Agr. ¶¶ 7.04, 7.11.) Where "there is a conflict between the allegations in the complaint and the contents of an attached exhibit, the exhibit controls." *Brokers' Choice of Am., Inc. v. NBC Universal*, Inc., 861 F.3d 1081, 1105 (10th Cir. 2017). The FAC fails to offer any facts suggesting actual authority, and the Broker Agreement rebuts the suggestion that UWM authorized the brokers to act as UWM's agents. *See New Millennium Consulting, Inc. v. United HealthCare Servs., Inc.,* 695 F.3d 854, 858

20

(8th Cir. 2012) (concluding that an agency disclaimer "precluded an agency relationship as a matter of law").

Further, the FAC fails to establish that UWM exercised control over the brokers' actions. Tenth Circuit courts have long held that an essential element of agency is the principal's right to control the agent's actions. *DeClements*, 2020 WL 9259326, at *3; *Coreslab*, 100 F.4th at 1136. Alleging "some degree of control" is not enough; agency requires the principal's control of the agent's "***day-to-day operations*** with respect to the instrumentality, conduct, or specific aspect of the [agent's] business that caused the plaintiff's injury." *Doe v. G6 Hosp. Prop. LLC*, 2025 WL 3537626, at *7 (W.D. Wash. Dec. 10, 2025); *In re Rare, LLC,* 298 B.R. 762, 766 (Bankr. D. Colo. 2003) ("It is not enough merely that Defendants asked Plaintiff to purchase wine and futures on their behalf and that Plaintiff undertook to do so".) "[T]he power to give ***interim instructions*** distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Alfaro-Huitron v. Cervantes Agribusiness,* 982 F.3d 1242, 1254 (10th Cir. 2020*)* (quoting Restatement (Third) of Agency § 1.01 cmt. (f)(1) (emphasis added)); *BASF Corp. v. Willowood, LLC,* 359 F. Supp. 3d 1018, 1026 (D. Colo. 2019) (actual authority was not established because the alleged principal lacked control over the subsidiary's specific operational activities). The FAC alleges no facts to establish that UWM controlled the brokers' day-to-day operations. "To set the bar for finding an agency as low as [Plaintiff] would have this Court set it would mean that every time

21

a person enters into an agreement to perform some service for another, that agreement would create a principal-agent relationship. Thus, virtually every commercial transaction would entail an agency relationship with all of the attendant legal consequences and fiduciary duties." *In re Rare, LLC,* 298 B.R. at 766.

Plaintiff points to brokers' access to UWM's trainings and various technology tools and resources. (FAC ¶¶ 31-39.) But the availability of certain tools does not equate to their required use. Nor does it equate to UWM's power to provide interim instructions and control brokers' day-to-day operations, as needed to establish agency. Courts have consistently rejected claims of vicarious liability in the absence of plausible allegations that the principal controlled the communications or had the authority to give an alleged agent interim instructions.[10]

---

[10]*See DeClements*, 2020 WL 9259326, at *3 (no actual authority where plaintiffs failed to allege defendant controlled "the calls its franchisees make, specifically"); *Kern v. VIP Travel Servs.,* 2017 WL 1905868, at *6 (W.D. Mich. May 10, 2017) (actual authority not plausibly alleged because, even assuming defendant contracted with telemarketers to solicit clients, the telemarketers were independent contractors required to comply with the law and retained control over how they performed their work); *N.T. v. Taco Bell Corp.*, 411 F. Supp. 3d 1192, 1197 (D. Kan. 2019) (dismissing plaintiff's complaint asserting vicarious liability because it did not properly allege, beyond conclusory allegations, that the franchisor retained control over the daily management of the franchisee); *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 451 (9th Cir. 2018) (no actual authority despite oversight and script approval by defendant where defendant lacked control over hours, call or sales quotas, and required compliance with law); *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1086 (C.D. Cal. 2012) (no agency for text message campaign run by franchisee where defendant, though aware of and funding the campaign, did not control its content); *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 521 (N.D. W.Va. 2016) ("assisting a party in setting up telemarketing centers or providing scripts for in-person calls is not evidence of agency").

The FAC also alleges that UWM "engages and authorizes mortgage brokers to sell its mortgage products over the phone," and "authorizes its brokers to utilize communication platforms that Defendant owns and controls to make such calls." (FAC ¶¶ 10, 30, 31.) The FAC mischaracterizes the controlling contract. Even though brokers may choose to utilize UWM's platforms to communicate with borrowers (Ex. 3, Broker Agr. ¶ 7.11), the Broker Agreement prohibits brokers from communicating on UWM's behalf. The Agreement does not limit the use of communication platforms to advertising for UWM only. In fact, the brokers may advertise the availability of "various loan programs and Broker's services" not limited to UWM products only. (*Id.*) Further, to use UWM's communication services, the Agreement requires the setup of a 10-digit long code phone number "on behalf and ***in the name of the Broker***." (*Id.* (emphasis added).) The FAC alleges that none of the calls came in the name of the Broker—suggesting only that none of UWM's communication services were used.

Further, in the same Agreement, brokers agree that they are not UWM agents, and that they are not obligated to submit any minimum number of loan applications to UWM. (*Id.* ¶¶ 7.03, 7.04, 7.11.) And more generally, nothing in the Broker Agreement requires mortgage brokers to sell UWM's products—whether by phone or other means. This situation is a far cry from the scenario that TCPA vicarious liability was intended to cover: where a principal hires an agent to make calls on the principal's behalf, in accordance with the principal's instructions.

Next, Plaintiff cites an unnamed 2023 "investigation" allegedly showing that a "large portion" of UWM brokers sent 99% or more of their loans to UWM. (FAC ¶ 36.) Regardless of whether some brokers chose to work primarily with UWM, brokers are not required to work exclusively with UWM. (Ex. 3, Broker Agr. ¶ 3.03(x).) They owe no performance quota to UWM and they need not submit loans to UWM at all. (*Id.* ¶ 7.03; Ex. 2, 10-K, at pp. 5, 7.) Where an independent agent works for multiple companies, cannot use defendant's name without consent, and is not subject to principal's control over day-to-day operations, a suggestion of actual authority is implausible. *See, e.g., Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 744 (W.D. Tex. 2023) (no actual authority because the independent agent worked for multiple companies, could not use defendants' name without consent, and was not controlled in its marketing or communications). This is particularly so where, as here, the contract requires the alleged agent's compliance with applicable laws. *See, e.g., In re Monitronics*, 223 F. Supp. 3d at 522-23 (no TCPA vicarious liability found where contracts required compliance with all laws); *Kern*, 2017 WL 1905868, at *6 (similar).

### 2. The FAC Fails To Plausibly Allege Apparent Authority.

To establish apparent authority, "a complaint must allege that the principal's 'manifestations' created a reasonable belief in a third party that the agent had authority to act on behalf of the principal." *DeClements*, 2020 WL 9259326, at *4 (quoting Restatement (Third) of Agency § 2.03); *Coreslab*, 100 F.4th at 1136-37. Critically, apparent authority "must be determined by the ***acts of the principal,***

***and not by the acts of the agent***." *Gresham v. Town of Depew, Oklahoma*, 2025 WL 752337, at *4 (10th Cir. Mar. 10, 2025) (emphasis added). It has long been established that "[l]iability based upon apparent authority requires reliance by the third party dealing with the agent upon manifestations by the principal." *Master Commodities, Inc. v. Texas Cattle Mgmt. Co.*, 586 F.2d 1352, 1358 (10th Cir. 1978).

Here, the FAC does not describe any acts whereby UWM held the brokers out as possessing sufficient authority to call Plaintiff on UWM's behalf. Plaintiff may argue that apparent authority is established by the fact that UWM supports its mortgage broker clients and "publishes a directory of its brokers at a consumer-facing website, mortgagematchup.com, which allows borrowers to connect with local UWM brokers in their area." (FAC ¶ 41.) But Plaintiff never alleged that she visited mortgagematchup.com or believed that the brokers acted on UWM's behalf by virtue of what Plaintiff saw on the website. Even if UWM said or did things that could have given rise to apparent authority, that apparent authority can only be asserted by someone who actually relied on it. *Master Commodities, Inc.*, 586 F.2d at 1358; *Bayless v. Christie, Manson & Woods Int'l, Inc.*, 2 F.3d 347 (10th Cir. 1993) ("before a third party can hold a principal liable for the acts of an agent on a theory of apparent authority, the third party must show that he changed his position because of his reasonable reliance on the conduct of the ***principal***.") (emphasis in original). Plaintiff alleges no such reliance.

More broadly, the FAC offers no facts showing that ***UWM*** held any mortgage

brokers or individual loan officers out as its agents or otherwise authorized the use of its name in consumer marketing. In fact, the opposite is true. (Ex. 3, Broker Agr. ¶¶ 3.03, 7.04, 7.11) (disclaiming any agency relationship and requiring compliance with all applicable laws and regulations). Plaintiff's allegations regarding the brokers' affiliation with UWM are based on brokers' own statements (FAC ¶¶ 47, 49, 52-53, 56, 78), which are legally insufficient for apparent authority. *Abolaji v. Parker 1833 LLC*, 2025 WL 2379644, at \*5 (D. Colo. Jan. 8, 2025) ("use of a franchisor's name by a franchisee alone is not sufficient to state a claim for vicarious liability").

### 3.  The FAC Fails To Plausibly Allege Ratification.

Ratification occurs when "the principal intended to ratify the actions ***and*** did so ***with full knowledge*** at the time of the ratification of all material facts and circumstances relating to the unauthorized act or transaction." *McCafferty v. Preiss Enters., Inc.*, 534 F. App'x 726, 733-34 (10th Cir. 2013) (emphasis added). Here, ratification fails for two reasons.

***No Knowledge Of Specific Wrongful Conduct***. Here Plaintiff does not, and cannot, allege that UWM knew of the material facts surrounding the calls at issue, or that they are unlawful. *See Cacho*, 739 F. Supp. 3d at 218 (rejecting ratification because complaint is "bereft of any allegation from which one could reasonably infer that Defendant knew or should have known that the telemarketers were violating the TCPA"). Nothing in the FAC suggests that UWM was aware of the calls to Plaintiff as they were being made. The November Letter listed only spoofed numbers

26

and does not provide sufficient detail about the callers such that UWM can reasonably identify who placed the calls. (Ex. 1, November Letter.) As the FAC acknowledges, spoofed numbers "hide [the callers'] true identity" to make the identification of the caller more difficult. (FAC ¶¶ 59-60.)

*No Alleged Benefit from Communications.* Regardless, UWM did not close a mortgage loan with Plaintiff or otherwise benefit from the brokers' calls. (FAC ¶ 61.) Because Plaintiff never obtained a UWM loan, UWM had no opportunity to knowingly ratify the brokers' conduct by knowingly accepting any benefits of the brokers' allegedly improper conduct. *See Roehrman v. McAfee, LLC*, 758 F. Supp. 3d 889, 899-900 (S.D. Ind. 2024) (no ratification where plaintiff "purchased no product in response to the offending text messages"); *DeClements*, 2020 WL 9259326, at *4 (similar). And general marketing by unrelated brokers is not the sort of benefit that can establish ratification.[11] Because the FAC fails to plausibly allege any facts supporting a vicarious liability theory, the Court should dismiss the claims with

---

[11] *DeClements*, 2020 WL 9259326, at * 4 ("It is not enough that [Defendant] might have endorsed or encouraged use of the techniques in question."); *Moore v. Charter Commc'ns, Inc.*, 523 F. Supp. 3d 1046, 1052-54 (N.D. Ill. 2020) (rejecting ratification even though defendant may have accepted other business from telemarketing calls because plaintiff did not allege defendant knowingly accepted any benefit from the calls made to him specifically); *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 745-46 (N.D. Ill. 2014) (rejecting ratification argument where plaintiff did not allege any benefit derived by defendant from calls to her); *Gonzales v. Cordoba Legal Grp., LLC*, 2026 WL 772359, at *4 (W.D. Tex. Feb. 5, 2026), *R&R adopted,* 2026 WL 790575 (W.D. Tex. Feb. 21, 2026) ("Speculation or inference based on the existence of a marketing relationship or the receipt of business opportunities is insufficient to establish ratification.");

27

prejudice.

## VI.    <u>THE COURT SHOULD STRIKE CLASS ALLEGATIONS.</u>

Because neither of the proposed classes can be certified, class allegations should be stricken at the pleadings stage. *See Faulhaber*, 656 F. Supp. 3d at 1271. The proposed classes are textbook examples of impermissibly fail-safe classes. A "fail-safe" class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). A fail-safe class "includes *only* those who are *entitled* to relief." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (emphasis in original). Such classes are forbidden because "either class members win or, by virtue of losing, they are not in the class and are not bound." *Id.* (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)).

Here, both classes include persons to whom "Defendant or *anyone acting on Defendant's behalf* initiated" the offending calls. (FAC ¶ 62, emphasis added.) The proposed class definitions therefore make class membership depend on the merits: a person is a class member only if the Court finds UWM directly or vicariously liable. If not, the person falls outside the class and is not bound by the judgment. That is the hallmark of an impermissible fail-safe class that must be stricken. *See Boyer v. Diversified Consultants, Inc.,* 306 F.R.D. 536, 540 (E.D. Mich. 2015) (striking proposed classes as impermissible fail-safes because they include only people who did not consent to defendants' contact and thus can prove a TCPA violation); *Bryant v.*

28

*King's Creek Plantation, L.L.C.*, 2020 WL 6876292, at \*3 (E.D. Va. June 22, 2020)

(striking nearly identical National DNC Registry class as impermissibly fail-safe);

*Beck v. Cuyahoga Cnty.*, 2022 WL 4363562, at \*6 (N.D. Ohio Sept. 16, 2022) (class

fail-safe where the court's determination on the merits determines class

membership).[12] The vicarious liability defect alone is sufficient to strike the proposed

classes. But the fail-safe problem runs even deeper.

The proposed classes are also fail-safe because they apply to any "telephone

solicitations," which potentially include text messages. (FAC ¶ 62.) Thus, class

membership cannot be determined without first resolving whether a text message

constitutes a "telephone call" under § 227(c)(5). The plain text of the statute limits

the private right of action to persons who received "telephone call[s]," and a growing

body of authority holds that text messages do not qualify.[13] Because the proposed

class definitions encompass persons who received "telephone solicitations" from

UWM's broker clients, the Court would need to make a threshold merits

determination for each putative class member as to whether a text message that

---

[12] *See also Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 132 (N.D. Tex. 2020) (denying certification of similar TCPA classes because "[f]ailure to show that each class member was called by the defendant's agent kills certification."); *Chinitz v. NRT W., Inc.*, 2019 WL 4142044, at \*5 (N.D. Cal. Aug. 30, 2019) (denying certification of TCPA class where differing levels of control over alleged agents created individualized determinations of liability).

[13] *See, e.g., Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1275-76 (N.D. Fla. 2025); *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 898-902 (C.D. Ill. 2025); *Irvin v. Sonic Indus. Servs., LLC*, 2026 WL 1098403, at \*3-5 (N.D. Ga. Apr. 20, 2026).

person received constitutes a "call" within the meaning of § 227(c)(5). If it does not, the putative member has no viable claim and, by definition, falls outside the class.

## VII.     CONCLUSION

The Court should transfer this case to the Michigan Court. If the Court declines to transfer, it should dismiss the FAC with prejudice for failure to state a claim or, at a minimum, strike the legally defective class allegations.

Dated: May 14, 2026                          Respectfully submitted,

FOLEY & LARDNER LLP

By:  */s/Irina Kashcheyeva*
Irina Kashcheyeva
Amir El-Aswad
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone: (313) 234-7100
Email: ikashcheyeva@foley.com
Email: ael-aswad@foley.com

Kelsey C. Boehm
FOLEY & LARDNER LLP
1144 15th Street, Suite 2200
Denver, CO 80202
Telephone: (720) 437-2000
Email: kboehm@foley.com

*Counsel for Defendant United Wholesale Mortgage, LLC*

30

## CERTIFICATION OF CONFERRAL

The undersigned counsel certifies that, on March 2, 2026, counsel for Defendant sent correspondence to counsel for Plaintiff identifying and explaining the substantive and jurisdictional deficiencies in Plaintiff's FAC. On May 12, 2026, counsel for Defendant further sought Plaintiff's concurrence in the relief requested by email. Such concurrence was not obtained.

Dated: May 14, 2026

Respectfully submitted,

FOLEY & LARDNER LLP

By: */s/Irina Kashcheyeva*
Irina Kashcheyeva
Amir El-Aswad
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone: (313) 234-7100
Email: ikashcheyeva@foley.com
Email: ael-aswad@foley.com

Kelsey C. Boehm
FOLEY & LARDNER LLP
1144 15th Street, Suite 2200
Denver, CO 80202
Telephone: (720) 437-2000
Email: kboehm@foley.com

*Counsel for Defendant United Wholesale Mortgage, LLC*

31

**<u>AI CERTIFICATION AS TO DEFENDANT UNITED WHOLESALE
MORTGAGE, LLC'S MOTION TO DISMISS AND STRIKE CLASS
ALLEGATIONS</u>**

The undersigned counsel certifies that any language drafted by AI was

personally reviewed by the filer or another human for accuracy and all legal citations

are to actual, non-fictitious cases or cited authority.


Dated: May 14, 2026                     Respectfully submitted,

                                        FOLEY & LARDNER LLP

                                        By:  */s/Irina Kashcheyeva*
                                        Irina Kashcheyeva
                                        Amir El-Aswad
                                        500 Woodward Avenue, Suite 2700
                                        Detroit, Michigan 48226
                                        Telephone: (313) 234-7100
                                        Email: ikashcheyeva@foley.com
                                        Email: ael-aswad@foley.com

                                        Kelsey C. Boehm
                                        FOLEY & LARDNER LLP
                                        1144 15th Street, Suite 2200
                                        Denver, CO 80202
                                        Telephone: (720) 437-2000
                                        Email: kboehm@foley.com

                                        *Counsel for Defendant United Wholesale
                                        Mortgage, LLC*

32

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of May, 2026, a true and correct copy of the foregoing was served via CM/ECF on all parties of record.

Dated: May 14, 2026

Respectfully submitted,

FOLEY & LARDNER LLP

By: */s/Irina Kashcheyeva*
Irina Kashcheyeva
Amir El-Aswad
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone: (313) 234-7100
Email: ikashcheyeva@foley.com
Email: ael-aswad@foley.com

Kelsey C. Boehm
FOLEY & LARDNER LLP
1144 15th Street, Suite 2200
Denver, CO 80202
Telephone: (720) 437-2000
Email: kboehm@foley.com

*Counsel for Defendant United Wholesale Mortgage, LLC*

33